UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| K.C., By His Parents and Next Friends, P.C. and K.C., | ) ) ) |
| Plaintiffs, | ) ) ) |
| and | ) Case No: 2:23-cv-333 |
| WABASH RIVER SPECIAL SERVICES COOPERATIVE and SOUTHWEST PARKE COMMUNITY SCHOOL, CORP., | ) ) ) ) ) ) |
| Defendants. | ) ) |

**COMPLAINT AND JURY DEMAND**

**I.    INTRODUCTION**

1. At all relevant times, K.C. lived with his parents, P.C. and K.C., in Montezuma, IN.

2. K.C. is an 11-year-old, 4th-grade student who has a diagnosis of autism. K.C. was enrolled at Montezuma Elementary School. Southwest Parke Community School Corporation qualified him for special education as a student with an emotional disability and speech impairment.

3. Throughout the 2022 – 2023 school year K.C. was subject to continuing and pervasive harassment, assaults, and bullying by students daily while in attendance at Montezuma Elementary School.

4. The parents and the student repeatedly and regularly appealed to school staff to address the bullying, supervision, and protection of K.C. throughout the 2022 – 2023 school year.

5. School staff did not protect K.C. from the abuse, assaults, or harassment by the other students.

6. Despite the repeated appeals from K.C. and his parents to the school for help, the school failed to address the unrelenting and daily bullying.

7. As a result, K.C. attempted to take his own life.

8. Plaintiffs now bring this lawsuit seeking fair compensation for K.C. and his family for injuries and damages and to ensure that in the future, the students at this school are kept safe and that the school administration institutes appropriate mandatory training and policies to ensure that no further bullying or cover-up of bullying and aggressive behaviors can ever happen again.

## II.   JURISDICTION

9. Jurisdiction over the federal civil rights claim is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(3) and (4). Jurisdiction over the state law claims is conferred by 28 U.S.C. § 1367(a). Venue is proper in this Division.

## III.   PARTIES

10. Plaintiff K.C. is a minor child and at all relevant times, a student at Montezuma Elementary School.

11. Plaintiffs P.C. and K.C. are the father and mother of K.C. and bring this action in their individual capacities and as parents and next friend of K.C.

12. K.C. is a qualified individual with a disability pursuant to the ADA because K.C. has a physical or mental impairment that substantially limits one or more major life activities including breathing, hearing, learning, reading, concentrating, thinking, and communicating.

13. Pseudonyms are being used as K.C. is a minor, with a disability, and this involves a suicide attempt, which is of a highly sensitive nature.

14. Defendant Southwest Parke Community School Corp. is an Indiana Public School Corporation. Its principal office is located at 4851 Coxville Rd, Montezuma, IN 47862. Defendant Southwest Parke Community School Corp is a local educational agency within Indiana.

15. Defendant Wabash River Special Services Cooperative is a Special Services Cooperative located in Covington, Indiana, that provides services, funds, personnel, and educational resources to Fountain, Parke, Vermillion, and Warren Counties in West-Central Indiana. Defendant Wabash River Special Services Cooperative is a local educational agency within Indiana and is capable of suing and being sued under the law of Indiana. It maintains as its principal office 1329 2nd St, Covington, IN 47932.

## IV.     STATEMENT OF FACTS

16. K.C. began attending Montezuma Elementary School in 1st grade at the beginning of the 2020 school year.

17. In August 2022, K.C. began his third-grade year. Within the first few weeks of school, the Mother spoke with William Livers, the District's social worker, about K.C. as K.C. had come home and told the Mother several times that he was being bullied by two female students calling him a "fag" and telling him to "go kill himself."

18. The Mother also messaged K.C.'s teacher, Lori Romanelli, about the two students. When K.C. started to tell the teachers what was happening regarding the bullying, he reported that they said, "I didn't see it, so I can't do anything about it."

19. In September 2022, K.C. again told the Mother that the two female students called him names and told him to kill himself. When the Mother discussed the continued bullying with teacher Lori Romanelly on multiple occasions between September – December 2022, she assured the Mother that she had told William Livers and Matthew Taylor about it.

20. The parents again spoke with Mr. Livers, regarding the bullying that K.C. was experiencing. K.C.'s mother offered to make herself available for a meeting to discuss the ongoing bullying.

21. To the best of the Mother's recollection, the same two students approached her older daughter in October 2022 and said, "Your brother is gay." K.C. continued to report bullying throughout October and November, which was occurring both within sight of staff and during recess. K.C. reported to the Mother that he was telling staff about the incidents.

22. In December 2022, the bullying escalated. K.C. was taunted by being called "gay" along with other names as well as being "picked on" in other ways. During recess, after name calling, K.C. reacted once by pushing back against the two female students who were engaging in the most aggressive bullying. Rather than come to K.C.'s aide, he was punished by a school staff member who made him stand with his nose against the bricks for a "time out." The parents were not contacted by school staff. When the Mother spoke with K.C., he said he was telling his teacher about the incidents. He also reported school staff made him stand with his nose against the school bricks. K.C. reported frequent time outs, seclusions in a small closet-sized room, and other disciplinary actions as a result of him reporting bullying, being a tattle tale, or attempting to self-advocate or "stand up for himself" to bullying.

23. In January 2023, beginning nearly immediately after K.C. returned from winter break, the bullying continued. At one-point K.C. asked the two female students what he did

wrong for them to treat him the way that they do, and K.C. reported to the Mother that they said "Nothing, we just don't like you."

24. Around this same time, a male student wanted to be friends with K.C. and K.C. agreed so that he could "be like all of the other boys" and "have friends." Due to K.C.'s autism he wanted to have friends and be liked, but it was often hard for him. The school did not assist him with respect to these relationships or provide him with protection from the continued bullying.

25. K.C. continued to report his bullying at school, and the Mother again encouraged him to make sure he was telling school staff about it when it happens.

26. In February 2023, both male and female students started to force K.C. to buy them ice cream at lunch. This was reported to the school. However, K.C. was threatened by other students if he told on them. K.C. said after initially trying to get help from school staff, that he told his teacher Lori Romanelly. He later said he recanted to her about it because he was told by the students that "snitches get stitches" and believed the bullying was going to get worse if he told on them again.

27. In February 2023, the bullying got substantially worse and seemed to go from verbal taunts, threats, and harassment to physical bullying. K.C. reported that students started throwing rocks at him, so he threw one back. K.C. was punished at school for this and was told that he should not retaliate. He was told he had to have "nose to brick" time out and was made to stand in time out again. The students continued to bully him while he was in time-out.

28. Around this same time, K.C.'s teacher, Lori Romanelly, called the Mother to tell her that she asked students to leave K.C. alone. The Mother was very hopeful that the school staff would take steps to ensure K.C. was safe and that the situation was being addressed.

When the Mother followed up with a subsequent call to Lori Romanelly regarding the continued bullying, she seemed irritated that the Mother attempted to follow up with her.

29. On March 3, 2023, K.C.'s mother sent a message to Mr. Matt Taylor, principal of Montezuma Elementary School, informing him of the bullying her son was experiencing. She stated in writing that other students called her disabled child with autism, a sociopath, a psychopath, a "faggot", and a loser.

30. On March 6, 2023, the parents again met with the Defendant's administrators Mr. Taylor and Mr. Livers about the ongoing bullying.

31. K.C.'s mother also completed an online google bullying form. Mr. Taylor confirmed receipt of the bullying report on March 7, 2023.

32. Still, the bullying continued and intensified.

33. The parents repeatedly brought up the bullying in the student's Individual Education Plan (IEP) meetings which were documented by the school in its own records.

34. When K.C. was questioned by his parents as to what was happening at school, he reported that students hounded and followed him at recess, threw rocks at him, and engaged in aggressive and physical bullying. They told K.C. that no one likes him, and he should go kill himself. A student suggested that he hang himself. One student even gave him a gun lock device which K.C. later used to hang himself. This was under the supervision, care, and responsibility of the Defendants of elementary school students, including K.C. who is a special needs child with autism.

35. The physical aspects of the bullying proceeded to get worse.

36. K.C. reported to the Mother that teacher Lori Romanelly regularly told him "she did not see it so she can't do anything about it."

37. In March 2023, name calling at recess continued, and lunch bullying continued to get worse. Students at lunch called K.C. names like "psychopath" and "gay" and made fun of him for having autism. Principal Matthew Taylor was only willing to talk to the Mother when Kendrick got in trouble.

38. On March 14, 2023, K.C. was again punished at recess when he attempted to respond to the bullying.

39. On March 15, 2023, K.C.'s mother picked him up from school. It was immediately apparent that her child was distraught. Teachers normally walked K.C. and his younger sister to their parents' vehicle in the school carpool line. But, on this day, the Mother asked to speak to the principal before leaving due to the level of her son's distress.

40. During the meeting with Mr. Taylor, K.C. told his mother and the principal that earlier in the day, when K.C. used the bathroom, several male students began trying to put his head in the toilet and were making fun of him. Another student pushed him. Feeling helpless and needing to defend himself, K.C. finally pushed the student back. Just as K.C. began to push, the other student's brother entered the bathroom. The student's brother screamed, "No one touches my brother!" He then put his hands around K.C.'s neck, putting him in a headlock, and applying pressure to the point that K.C. felt he was losing consciousness. The other student's brother broke K.C.'s necklace during the incident, further adding to K.C.'s distress.

41. It has been reported that one of the boys again told K.C. to kill himself but then said "You're a pussy, you won't do it."

42. K.C. freed himself and ran out of the bathroom and down the hallway crying. No teachers came to help him. A female student witnessed K.C. crying and told her teacher about

it. The teacher walked K.C. to the Mother's car and told her what happened.  It was apparent to the Mother that this teacher was aware of the repeated bullying.

43. The Mother spoke to administrator Matthew Taylor again about these issues and he only asked K.C. what he had said first to get the other student to react that way. Matthew Taylor said, "boys will be boys" in response to the incident.

44. Instead of appropriately responding to K.C.'s reports of being the victim of bullying, Mr. Taylor implied that K.C. had possibly caused or escalated events.

45. On the evening of Wednesday, March 15, 2023, K.C. attempted suicide at home by hanging after being a long-term victim of ongoing bullying at school.  K.C. believed he had no choice but to take his own life. He could no longer take the Defendants' indifference to his reports of the relentless bullying he was enduring at school. His Mother found him in his closet, unresponsive and hanging from the gun lock device given to him earlier by another student.

46. Unable to find a pulse, K.C.'s father initiated CPR and notified 911. Emergency responders intubated the child at the scene.  He was airlifted by helicopter to Peyton Manning Children's Hospital in Indianapolis where he was sedated and placed on life-support. He remained on a ventilator for five (5) days and was extubated on March 20, 2023. He remained at Peyton Manning for the next twelve (12) days.

47. Upon his discharge from Peyton Manning on March 27, 2023, K.C. was admitted to Harsha Behavioral Center as an inpatient for psychiatric care.

48. Numerous Harsha medical records clearly document that K.C. reported being told by other students he was worthless, was harassed for having autism, and was called a monkey. He reported to Harsha staff that it was better to be dead than to have to continue to deal with the school bullies.

49. Several mental health providers at Harsha have notified the Defendants in writing about K.C.'s suffering from the severe bullying at school from other students. The providers also informed the Defendants that K.C.'s suicide attempt was a proximate result of the bullying.

50. On April 4, 2023, the child's psychiatrist, Dr. Darla Hinshaw, wrote to the Defendants recommending that K.C. be permitted to complete the remainder of the school year virtually. She stated her professional opinion was that returning to school so soon after K.C.'s suicide attempt would be detrimental to his mental health, especially considering the Defendants' deliberate indifference to the bullying.

51. K.C. has not returned to in-person school since his suicide attempt on March 15, 2023.

52. On or about April 18, K.C.'s mental health providers diagnosed him with Post-Traumatic Stress Disorder. He continues to experience panic attacks so severe he struggles to catch his breath. He participates in therapeutic counseling at least once a week. He is unable to complete more than ten (10) minutes of schoolwork at a time before he becomes so fatigued, he cannot continue.

53. Defendants were aware of the bullying, failed to take steps to protect K.C., and were deliberately indifferent to K.C.'s mother's notices that K.C. was the victim of intense bullying from other students that ultimately led to the child's suicide attempt.

54. The Defendants failed to exercise reasonable care for K.C.'s safety, failed to adequately supervise and train its staff, and were deliberately indifferent to all reports of the bullying K.C. was enduring in school.

55. K.C.'s suicide attempt was a proximate result of the Defendants' failure to exercise their duties to protect him.

56. These incidents of ongoing bullying and the Defendants' allowing the victim to be exposed to harassment from other students, occurred on school property and during school hours.

57. Upon information and belief, none of the other students involved in the bullying of K.C. were ever disciplined and they remain as students at the school.

58. When the Mother reported the bullying and suicide attempt to the Superintendent, Phil Harrison, and asked for a safety plan for her two daughters who were still attending the school, Mr. Harrison said that the children are just saying things and don't really mean anything. Likewise, in response, Mr. Taylor said that he knew the parents of the children and they wouldn't say things like that.

59. The Defendants' deliberate indifference towards the bullying and harassment reports illustrate their reckless and grossly negligent acts or omissions of individuals employed by the Defendants, as well as the Defendants' wrongful or absent policies and practices.

60. The Defendants failed to exercise reasonable care and supervision of the students at school, failed to educate staff on the responsibilities to report bullying, failed to provide adequate instruction on bullying prevention to its students per Indiana Code 70-30-5-5.5, and were negligent in failing to address the student's psychological needs when they learned the bullying and harassment was occurring on their property during school hours.

61. Among other things, the Defendants either failed to have adequate policies, procedures, protocols, and training in place as to how to deal with bullying reports, or alternatively, failed to follow their own policies, procedures, protocols, and training in this instance.

62. The Defendants' wrongful acts or omissions may be continuing, or ongoing and additional investigation is necessary to determine whether there are other dates of loss.

63. The qualified immunity afforded the Defendants and their employees by Indiana Code 20-20-40-15(c) is inapplicable here because it only applies to actions taken by school staff "if the action is taken in good faith and is reasonable." The same applies for the immunities provided in the Indiana Tort Claims Act, including but not limited to Indiana Code 34-13-3-3(20).

**Defendants Fostered and Covered Up Bullying and Aggressive Behavior
at Montezuma Elementary School**

64. It is the goal of the State Board of Education to enhance/create positive learning and teaching environments. The State Board of Education defines a positive climate as "one that emphasizes and recognizes positive behaviors, evokes nonviolence, cooperation, teamwork, understanding and acceptance toward all students and staff in, and in transit to and from, the school environment." The Indiana Department of Education provides "model policies and strategies that eliminate negative behaviors and recognize positive behaviors that promote safe and secure learning environments for all students and staff. This model policy has informed local schools as they establish policies that assist school personnel to identify and address issues of bullying, intimidation and harassment that occurs between students[.]"

65. Montezuma Elementary is one of two elementary schools in Montezuma, Indiana and one of approximately 1,982 elementary schools in the Indiana Public Schools system. During the 2021-2022 school year, Montezuma Elementary served approximately 238 students, from preschool through sixth grade.

66. According to the Annual Report on "Schools Bullying, Safety Staffing, and Arrests Report" for 2021-2022 school year, Montezuma Elementary reported no incidents of any type of bullying. In all schools within the Southwest Parke Community School Corporation,

including its high school, only two incidences of bullying were reported for a school corporation that services over 1,000 students.

67.  During this same time frame, 5,103 incidents of bullying were reported to the Indiana Department of Education by other school corporations. And, by way of example, other school districts reported 655 incidents (South Bend) and 103 incidents (Elkhart) of bullying.

**Bullying Leads to Suicide**

68.  Many studies have established a connection between bullying and suicide in young people. The phenomenon is sometimes colloquially referred to as "bullycide."

69.  These studies have found that bullying is a significant contributor to suicidal ideation.[1]

70.  Frequent physical assault is also associated with increased odds of suicidal ideation.[2]

71.  A review of cross-sectional and longitudinal findings showed that "there is an increased risk of suicidal ideation and (or) suicide attempts associated with bullying behavior."[3]

72.  As educators, Defendants are aware of the link between bullying and suicide in school children.

73.  Shortly after K.C.'s suicide attempt was revealed to the Defendants, Principal Taylor was asked to, and did, resign based on numerous complaints from staff and parents about lack of discipline and other issues, including bullying at Montezuma Elementary.

---

[1] Suicidal ideation among suburban adolescents: The influence of school bullying and other mediating risk factors. J. Child Adolesc. Ment. Health, 2016 Oct; 28(3): 213-231.
[2] Associations of childhood bullying victimization with lifetime suicidal behaviors among new U.S. Army soldiers. Depress Anxiety, 2017 Apr 3.
[3] The Association of Suicide and Bullying in Childhood to Young Adulthood: A Review of Cross-Sectional and Longitudinal Research Findings.

12

## V.     <u>FIRST CAUSE OF ACTION – § 1983 – STATE CREATED DANGER</u>

74. Defendants have, under color of law, deprived K.C. and Plaintiffs of rights, privileges, and immunities secured to them by the United States Constitution including the right to due process under the Fourteenth Amendment, and specifically to the right to be free from affirmative actions, directly increasing K.C.'s vulnerability or otherwise placing him in danger and taking away from his parents their ability to protect him.

75. Defendants acted with deliberate indifference when they put K.C.'s life at risk and caused him to suffer greatly. Defendants acted with deliberate indifference when they concealed from his parents the danger K.C. was in at school, causing them serious emotion distress when they could not protect him.

## VI.     <u>SECOND CAUSE OF ACTION – § 1983 – SPECIAL RELATIONSHIP</u>

76. Defendants have, under color of law, deprived K.C. and Plaintiffs of rights, privileges, and immunities secured to them by the United States Constitution including the right to due process under the Fourteenth Amendment, and specifically to the right to be kept safe when a special relationship has been created and by taking away from his parents their ability to protect him.

77. The Defendants' actions put K.C.'s life at risk and caused him to suffer greatly, the source/origin of which was personal physical injury. Defendants acted with deliberate indifference when they concealed from his parents the danger K.C. was in at school, causing them serious emotional distress when they could not protect him.

## VII. THIRD CAUSE OF ACTION – § 1983 – SHOCKS THE CONSCIENCE

78. Defendants have, under color of law, deprived K.C. and Plaintiffs of rights, privileges, and immunities secured to them by the United States Constitution including the right to due process under the Fourteenth Amendment, and specifically to his right to be free from government actions that shock the conscience.

79. Defendants' actions put K.C.'s life at risk and caused him to suffer greatly, the source/origin of which was personal physical injury. Defendants acted with deliberate indifference when they concealed from his parents the danger K.C. was in at school, causing them serious emotional distress when they could not protect him.

## VIII. FOURTH CAUSE OF ACTION – §1983 – EQUAL PROTECTION

80. Defendants have, under color of law, deprived K.C. and Plaintiffs of rights, privileges, and immunities secured to them by the United States Constitution including the right to equal protection under the Fourteenth Amendment.

81. Defendants violated K.C. and Plaintiffs' equal protection rights when they treated students who were victims of bullying and student-on-student aggression differently than they treated students who were in accidents at school. While students who experience accidents at school are given appropriate and adequate medical treatment, and their parents are informed of the incident, students who are victims of bullying and student-on-student aggressive behavior are not protected, their medical needs are not taken seriously, and their parents are not informed of the incident or the injury, thus depriving them of the ability to protect their son.

82. There is no rational basis in treating these two groups differently.

83. Defendants' actions put K.C.'s life at risk and caused him to suffer greatly. Defendants acted with deliberate indifference when they concealed from his parents the danger K.C. was in at school, causing them serious emotional distress when they could not protect him.

## IX.     FIFTH CAUSE OF ACTION - §1983

84. Defendants failed to provide an adequate policy to guide Defendants, school officials, and teachers responding to bullying, violence, and student-on-student aggression such as what happened to students like K.C.

85. Defendants failed to adequately train and supervise Defendants, school officials, and teachers on how to respond to incidents like those experienced by students like K.C.

86. Defendants failed to conduct a meaningful investigation into the actions of school officials such as Mr. Taylor and thus ratified their actions as official policy, causing Defendants to be liable for their constitutional violations.

87. The failure to provide adequate policies, training, supervision, monitoring, and investigation of Defendants' actions was outrageous and deliberately indifferent to the rights of students, including K.C.

88. Defendants' rules, regulations, customs, policies, practices, usages, procedures, inadequate training and supervision, and ratification of Defendants' actions, were all inadequate and unreasonable and were the moving force behind the constitutional deprivations suffered by K.C. and Plaintiffs.

### X.   SEVENTH CAUSE OF ACTION – INTENTIONAL INFLICTION OF SERIOUS EMOTIONAL DISTRESS

89.   Defendants have, by their extreme and outrageous conduct, intentionally or recklessly inflicted severe emotional distress on K.C. and Plaintiffs.

90.   The distress inflicted on Plaintiffs was the originating substantial factor in K.C.'s suicide attempt, the ultimate personal physical injury.

### XI.   EIGHTH CAUSE OF ACTION – NIED

91.   Defendants negligently and recklessly inflicted severe emotional distress on K.C.'s parents, bystanders to their son's suicide attempt.

92.   Defendants negligently and recklessly inflicted severe emotional distress on K.C.'s parents, each bystander to their son's attempted suicide.

93.   Defendants' actions were not only negligent but reckless.

### XII.  TENTH CAUSE OF ACTION – FAILURE TO REPORT CHILD ABUSE

94.   K.C. was an abused child under Indiana Code 31-33-22-1.

95.   Defendants were aware that K.C. was an abused child under the statute.

96.   This child abuse was not reported by Defendants as required under Indiana law. As a result of these Defendants' failure to report child abuse, K.C. suffered further injury, including mental anguish and severe emotional injury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court award:

   A.  Compensatory damages in an amount to be shown at trial;

   B.  Punitive damages in an amount to be shown at trial;

C. Costs incurred in this action and reasonable attorney fees under 42 U.S.C. §1988;

D. Prejudgment interest; and

E. Such other and further relief as this Court may deem just and appropriate.

## JURY DEMAND

Plaintiffs request a jury trial on all claims triable to a jury.

Dated: July 1, 2023.

Respectfully submitted,

*/s/ Tammy J. Meyer*
Tammy J. Meyer, #14612-49
METZGER ROSTA LLP
32 S. 9th Street
Noblesville, Indiana 46060
Telephone: (317) 219-4606
Facsimile: (317) 214-9437
Email: tammy@metzgerrosta.com

*/s/Catherine Michael*
Catherine Michael, IN Bar No. 22474-49
Connell Michael Kerr, LLP
550 Congressional Ave., Suite 115
Carmel, IN 46032
Ph: (317) 343-4482
Facsimile: (317) 348-2916
Email: catherine@cmklawfirm.com

*Attorney for Plaintiffs*